IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| CEDRIC DENT, | CIVIL ACTION NO. 2:23-cv-03104 |
| v. | JUDGE |
| JASON R. WILLIAMS, in his official capacity as Orleans Parish District Attorney, | MAGISTRATE |
| ABC INSURANCE COMPANIES 1-10, | **JURY DEMAND** |

## COMPLAINT

Plaintiff Cedric Dent files this complaint by which he seeks compensatory, nominal, and punitive damages; costs and attorneys' fees; and any and all other relief to which he may be entitled under law or equity for the defendants' violations of the United States Constitution and Mr. Dent's civil rights, resulting in Mr. Dent's incarceration for almost 25 years for a crime he did not commit. Mr. Dent alleges the following:

### INTRODUCTION

1.      Because of numerous constitutional violations by the Orleans Parish District Attorney's Office ("OPDA"), Cedric Dent was wrongfully convicted and served almost 25 years in prison for a crime he did not commit. From the time of Mr. Dent's arrest in 1997 through at least 2021, OPDA—in violation of its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny—suppressed material favorable evidence.

2.      Mr. Dent was arrested in 1997 on suspicion of murdering Anthony Melton at approximately 10 p.m. on September 2, 1997, in the St. Thomas housing projects in New Orleans.

3.      Under the leadership of Harry Connick Sr., OPDA prosecuted Mr. Dent in Orleans Parish Criminal District Court for second-degree murder in Case No. 393-154.

4.      No physical evidence tied Mr. Dent to the crime.

5.      Mr. Dent made no inculpatory statements about the crime.

6.      Mr. Dent was tried before a jury in May 1999. His trial lasted less than two hours.

7.      The State's only evidence at trial was the testimony of Jerry Hamilton, the decedent's 18-year-old cousin who viewed the perpetrator for a few moments in a dark lot.

8.      The jury convicted Mr. Dent of second-degree murder. The jury's guilty verdict was not unanimous.

9.      OPDA suppressed exculpatory information documenting Mr. Hamilton's different accounts of what he saw the night of the crime and the significant inconsistencies in his narrative. This information includes: (1) a New Orleans Police Department ("NOPD") officer's notes of his interview with Mr. Hamilton at the crime scene on September 2, 1997; (2) Mr. Hamilton's statement to Detective Gary Marchese at 11:00 p.m. on September 2 at the Sixth District Station; (3) Assistant District Attorney ("ADA") Jay Quinlan's notes of his interview with Mr. Hamilton on November 10, 1997 in advance of his grand jury testimony; and (4) the transcript of Mr. Hamilton's testimony before the grand jury on November 13, 1997. These accounts that OPDA suppressed were internally inconsistent, conflicted with each other, and conflicted with Mr. Hamilton's testimony at trial.

10.      OPDA also suppressed at least three other key documents—Detective Michael Buras's handwritten notes, his Major Offense Report Form ("MORF"), and an unredacted version of his incident report—that contained several pieces of exculpatory information, including how Mr. Dent became a subject of NOPD's investigation, a potential death threat in a message left on Mr. Melton's pager several hours before he was shot, a message from Mr. Hamilton left on the pager less than thirty minutes before the shooting, and the existence of a second witness named "Rodney," who provided a description of the perpetrator that did not match Mr. Dent's appearance

at the time of his arrest.

11.     Because OPDA suppressed the information described in paragraphs 9 and 10 above and failed to disclose it to defense counsel, Mr. Dent was convicted of second-degree murder. He was sentenced to life imprisonment without the possibility of parole.

12.     Over the next two decades, OPDA continued to withhold critical exculpatory information despite requests by Mr. Dent and his counsel for records.

13.     For example, responding to Mr. Dent's request for records in 2008, OPDA disclosed some, but not all, of the exculpatory information. Notably, OPDA disclosed the unredacted version of Detective Buras's incident report but not his notes that provided the basis for its key portions. In 2020, OPDA disclosed more documents in response to a request for records filed by the Innocence Project New Orleans ("IPNO"), but this production did not include, among other things, Detective Buras's handwritten notes.

14.     It was not until November 29, 2021—more than 22 years after Mr. Dent was convicted—that NOPD, not OPDA, disclosed Detective Buras's handwritten notes, which list the numbers on the decedent's pager, document Rodney's description of the perpetrator, and explain how an anonymous woman injected Mr. Dent's name into NOPD's investigation. OPDA's failure to disclose Detective Buras's notes and other exculpatory information eventually produced by NOPD reveals that OPDA never fulfilled its obligation to obtain the information from law enforcement.

15.     In the face of evidence revealing OPDA's suppression of exculpatory information, OPDA moved to vacate Mr. Dent's conviction.

16.     The Orleans Parish Criminal District Court vacated Mr. Dent's conviction on August 8, 2022, and Mr. Dent was released from prison after serving almost 25 years for a crime

he did not commit.

17.    OPDA's violation of Mr. Dent's constitutional rights was not an isolated incident. To the contrary: it was a direct and proximate result of OPDA's longstanding policy or custom of violating the constitutional rights of the defendants it prosecuted by not disclosing information favorable to their defense.

18.    Mr. Dent now brings this action against OPDA within one year of his release from incarceration to recover damages under 42 U.S.C. § 1983 for the injuries he suffered and losses he sustained as a result of OPDA's policy or custom of violating the constitutional rights of defendants by not disclosing information favorable to their defense, and to hold OPDA accountable for depriving him of almost 25 years of his liberty.

## JURISDICTION AND VENUE

19.    This Court has subject matter jurisdiction over Mr. Dent's 42 U.S.C. § 1983 claim pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

20.    This Court has subject matter jurisdiction over Mr. Dent's state-law claim pursuant to 28 U.S.C. § 1367.

21.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

## PARTIES

22.    Plaintiff Cedric Dent is an adult citizen of New Orleans, Louisiana, in the Eastern District of Louisiana. Mr. Dent was wrongfully convicted of second-degree murder; sentenced to life without the benefit of probation, parole, or suspension of sentence; and served almost 25 years of that sentence before his release.

23.    Defendant Jason R. Williams, whom Mr. Dent sues in his official capacity only, is the Orleans Parish District Attorney and the autonomous policymaker for OPDA, with respect to the policies and practices that govern OPDA evidence disclosure duties.

24.     Defendants ABC Insurance Companies 1–10 are as-yet unknown insurance companies who may have issued and currently have in effect one or more policies of insurance covering Defendant Williams and OPDA and/or the actions complained of herein.

## FACTUAL BACKGROUND

### I.     Mr. Dent is wrongfully convicted for second-degree murder

25.     On September 2, 1997 at about 10 p.m., Anthony Melton[1] was shot and killed in what lead detective Michael Buras described as a "poorly lit" vacant lot in the St. Thomas housing projects. Jerry Hamilton, Mr. Melton's cousin, testified that he was with Mr. Melton at the time of the shooting and ran away after the shots were fired.

26.     The perpetrator shot Mr. Melton once from behind and ran away.

27.     Mr. Hamilton picked Mr. Dent's photo from a photo array on September 4, 1997, and a warrant for Mr. Dent's arrest was issued.

28.     A few days after the arrest warrant issued, Mr. Dent heard that he was wanted for a crime he knew nothing about. On September 13, he went with his family to the Third District Station and told Detective Chris Billiot and Officer Richard Manguia that he had learned he was wanted for a murder and was turning himself in. He asked the detective and officer, "Just because someone says I murdered someone that means it's true?" He told Detective Billiot that on the night of the crime, he was at a movie theatre watching a film named *Hoodlum*.

29.     *Hoodlum* was a crime drama movie that was released in 1997 and starred Laurence Fishburne, Andy Garcia, and Vanessa Williams. On the night of September 2, 1997, the movie was playing at the Belle Promenade 14 in Marrero, where Mr. Dent was watching it.

---

[1]     Mr. Melton is referred to variously as "Anthony Milton" and "Anthony Melton" in documents related to this case. According to obituaries placed by his family by the time of his death, Melton is correct.

30.     At the time of his arrest and around the time of the shooting, Mr. Dent had several easily visible front gold teeth, a mustache, and a flat-top haircut.

31.     On May 17 and 18, 1999, Mr. Dent was tried before a jury. The Honorable Terry Q. Alarcon of the Orleans Parish Criminal District Court presided over the trial.

32.     At trial, OPDA introduced as evidence the bullet that was removed from Mr. Melton's body, the autopsy protocol, the photo array that NOPD had shown Mr. Hamilton, and photos of the crime scene. No physical evidence tied Mr. Dent to the crime.

33.     Testimony was given by Mr. Melton's aunt Ransey Melton; Detective Billiot; Detective Buras; Dr. Paul McGarry, who performed the autopsy and who served as an expert witness; and the prosecution's lone purported eyewitness Mr. Hamilton.

34.     Mr. Dent was convicted of second-degree murder by a non-unanimous jury.

35.     Mr. Dent was sentenced to life without the benefit of probation, parole, or suspension of sentence.

36.     After Mr. Dent served almost 25 years for a crime he did not commit, the Orleans Parish Criminal District Court vacated his conviction on August 8, 2022, and he was released from prison following entry of the court's order.

37.     While incarcerated, Mr. Dent suffered numerous injuries and extraordinary damage including pain and suffering, mental anguish, emotional distress, lost income, lost earning capacity, physical illness, inadequate medical care, humiliation, injury to his reputation, psychological damage, and restriction of numerous forms of personal freedom, including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, personal fulfillment, family relations, travel, enjoyment, and expression.

II.     **Mr. Dent requests material, favorable information—which he was constitutionally**

**entitled to receive—and OPDA fails to satisfy his requests**

38.     Since he was arrested in September 1997, Mr. Dent has maintained his innocence.

39.     Mr. Dent filed a counseled appeal from his conviction, alleging insufficiency of the evidence. On January 24, 2001, the Louisiana Fourth Circuit Court of Appeal affirmed the conviction and sentence.[2] Mr. Dent filed a timely pro se Writ Application with the Louisiana Supreme Court seeking review of his appeal. The application was denied without reasons on January 11, 2002.[3]

40.     On July 14, 2005, Mr. Dent submitted to the U.S. District Court for the Eastern District of Louisiana a pro se petition for issuance of a writ of habeas corpus pursuant to 28 U.S.C. § 2254. On July 19, 2006, the Honorable Martin L.C. Feldman adopted Magistrate Judge Karen Wells Roby's report and recommendation and dismissed the petition as time-barred.[4]

41.     On August 18, 2008, while incarcerated at Louisiana State Penitentiary at Angola, Mr. Dent submitted a pro se request for records from OPDA, specifically "the entire D.A. files under case number 393-154."

42.     On November 20, 2008, OPDA Records Manager John Rohr responded and claimed to attach "a copy of the record you request," finally disclosing, almost 10 years after Mr. Dent's trial, (1) the transcript of the statement that Jerry Hamilton gave to Detective Marchese on September 2, 1997, and (2) an unredacted version of Detective Buras's incident report.

43.     Notably, however, OPDA did not disclose the responding NOPD officer's notes of Mr. Hamilton's statement at the crime scene, ADA Quinlan's notes of Mr. Hamilton's statement,

---

[2]     *See State v. Dent*, 2000-0127 (La. App. 4th Cir. 1/24/01), 786 So. 2d 981; *see also Dent v. Cain*, No. 05-2595, 2006 WL 2038161, at *1 (E.D. La. July 19, 2006).

[3]     *State v. Dent*, 2001-0774 (La. 1/11/02), 807 So. 2d 228.

[4]     *Dent*, 2006 WL 2038161, at *1.

the transcript of Mr. Hamilton's grand jury testimony, Detective Buras's handwritten notes, or his Major Offense Report Form or MORF.

44.     After reviewing the newly disclosed OPDA documents on his own, Mr. Dent identified several pieces of favorable information that were material to his innocence—namely, Mr. Hamilton's statements to Detective Marchese that sharply conflicted with his testimony at trial; the existence of an unnamed woman who supposedly provided Mr. Dent's name to the decedent's mother Valirey Melton, who then relayed it to Detective Buras; and a message on Mr. Melton's pager sent by Mr. Hamilton shortly before the shooting.

45.     In June 2009, Mr. Dent submitted to the Orleans Parish Criminal District Court a pro se application for post-conviction relief, in which he alleged that OPDA—in violation of its obligations under Brady and its progeny—suppressed material favorable evidence. Mr. Dent argued that OPDA's suppression of Mr. Hamilton's statement to Detective Marchese and Mr. Hamilton's call to Mr. Melton's pager shortly before the shooting prevented his defense counsel from cross-examining Mr. Hamilton at trial and impeaching his testimony. Mr. Dent also argued that OPDA's suppression of the existence of an unnamed woman prevented defense counsel from identifying her, interviewing her, exploring how Mr. Dent's name was introduced to NOPD's investigation, and questioning her about factual inaccuracies in her supposed statement, including Mr. Dent's actual home address at the time.

46.     Mr. Dent's June 2009 application for post-conviction relief was pending before the court until August 2022, when the Criminal District Court ultimately vacated his unconstitutional conviction.

47.     On December 9, 2010, Mr. Dent filed a pro se motion for an order authorizing the U.S. District Court for the Eastern District of Louisiana to consider a successive habeas petition

pursuant to 28 U.S.C. § 2254. He sought to argue, among other things, that the prosecution suppressed favorable evidence material to his innocence, including evidence that could have been used to cross-examine the prosecution's lone purported eyewitness Mr. Hamilton.[5]

48.     On March 2, 2020, the Innocence Project New Orleans ("IPNO") submitted to OPDA's records custodian a public records request seeking an "opportunity to inspect all records maintained by any member or division of" OPDA related to the prosecution of Mr. Dent for the murder of Mr. Melton. On March 25, 2020, OPDA disclosed approximately 728 pages of records. Then, although the request for public records was not broader than the request Mr. Dent made in 2008, OPDA disclosed roughly 123 pages of records on September 24, 2020 not tendered to Mr. Dent in 2008, including ADA Quinlan's notes from his November 10, 1997 meeting with Mr. Hamilton, and the transcript of Mr. Hamilton's grand jury testimony.

49.     On March 2, 2020, IPNO also submitted a records request to NOPD, specifically requesting the "complete original of the Homicide Unit Detective's File . . . for the investigation into the September 2, 1997 homicide of Anthony Milton." On March 31, 2020, in response, NOPD disclosed approximately 50 pages of records, which included Detective Buras's Major Offense Report Form or MORF.

50.     On April 2, 2020, IPNO informed NOPD that several documents were missing from its March 31 production and requested the opportunity to view the file in person. On July 7, 2020, NOPD staff wrote back that they could not find the file.

51.     In April 2021, Mr. Dent submitted to the Orleans Parish Criminal District Court another pro se application for post-conviction relief.

---

[5]     On January 13, 2011, the Fifth Circuit denied Mr. Dent's motion. *In Re: Cedric Dent*, No. 10-31193 (5th Cir. 2011).

52.     Also in April 2021, the Promise of Justice Initiative enrolled to represent Mr. Dent on the issue of the non-unanimous jury verdict, and later began to represent Mr. Dent with respect to his application for post-conviction relief.

53.     On August 4, 2021, the Orleans Parish Criminal District Court granted a request by Mr. Dent's counsel for a subpoena of the NOPD Homicide Division's file. In the face of a judicial subpoena, NOPD located the file and on November 29, 2021, NOPD produced the responding NOPD officer's notes of Jerry Hamilton's statement at the crime scene, Detective Buras's handwritten notes, and the RAP sheet he generated for Mr. Dent on September 4, 1997 with a time stamp.

54.     OPDA has never produced the responding officer's notes, Detective Buras's handwritten notes, his MORF, or the RAP sheet that he generated on September 4, 1997.

55.     In May 2022, IPNO supplemented Mr. Dent's previous applications for post-conviction relief, which among other arguments, emphasized that several pieces of favorable material information were suppressed in violation of *Brady*.

## III.   Mr. Dent uncovers repeated violations by OPDA of his constitutional right to the disclosure of material, favorable information

56.     The documents that Mr. Dent and his counsel obtained as a result of over 12 years of records requests revealed that OPDA withheld from Mr. Dent favorable information relating to the murder of Mr. Melton that was material to Mr. Dent's guilt or innocence. This includes information revealing (A) the extent of the inconsistencies in the narrative of the lone purported eyewitness Jerry Hamilton, as well as his description of the shooter that was inconsistent with Mr. Dent's appearance at the time of his arrest; (B) the existence of an unnamed woman who supposedly provided Mr. Dent's name to Valirey Melton, who then relayed it to Detective Buras, and is likely the only reason Mr. Dent became a subject of NOPD's lagging investigation; (C)

messages on Mr. Melton's pager including a possible death threat that the decedent received six hours before he died, as well as a call from the same number only 50 minutes before the murder; and (D) the statement of a second, undisclosed eyewitness "Rodney" who provided a description of the shooter that did not match Mr. Dent's appearance at the time of his arrest.

### A.   *Jerry Hamilton's prior statements that contradicted his testimony at trial*

57.     Jerry Hamilton was only 18 years old on the night he testified that he witnessed his cousin's murder.

58.     From the time of the shooting through trial, Mr. Hamilton provided at least six statements regarding what he saw the night of the crime: (1) to an NOPD officer at the scene of the crime on September 2, 1997; (2) to Detective Marchese at the Sixth District Station later that night; (3) to ADA Quinlan on November 10 in advance of his grand jury testimony; (4) before the grand jury on November 13; (5) before Judge Alarcon at a motion to suppress identification hearing on June 14, 1998; and (6) before the jury during Mr. Dent's trial on May 18, 1999.

59.     As noted in Section II, OPDA did not disclose the first four statements, and that information was withheld from Mr. Dent until 2008, 2020, and 2021.

60.     In Mr. Hamilton's prior statements, his description of the shooter clearly did not match Mr. Dent's appearance at the time of his arrest, and it omitted Mr. Dent's most obvious features—his visible front gold teeth, his mustache, and his flat-top haircut.

61.     Moreover, Mr. Hamilton's testimony at trial on May 18, 1999 contradicted his prior statements to NOPD and OPDA with respect to when he allegedly first noticed the shooter and his opportunity to observe the shooter.

#### 1.   *Mr. Hamilton's description of the shooter*

62.     At trial, Mr. Hamilton made an in-court identification of Mr. Dent. Neither Mr. Hamilton nor any other witness testified about any description of the shooter that Mr. Hamilton

had provided the police.

63.     Unbeknownst to the defense, when Mr. Hamilton spoke to the NOPD officer at the crime scene, he said that the shooter was "short, brow[n] skinned" and had "short hair."

64.     When Mr. Hamilton spoke to Detective Marchese later that night, he said that the shooter was "short about 5'6" with short short hair."

65.     In neither Mr. Hamilton's statement to the NOPD officer nor his statement to Detective Marchese (or in any of his statements to law enforcement) did he ever describe the shooter as having gold teeth, a mustache, or a flat-top haircut.

66.     NOPD's arrest report documents that Mr. Dent was 5'10" at the time of his arrest on September 13, 1997, 11 days after the shooting. He also had several readily visible front gold teeth, a mustache, and a flat-top haircut.

### 2.     Conflicting accounts of when Mr. Hamilton first saw the shooter

67.     At trial, Mr. Hamilton testified that on the night of the shooting, he left Mr. Melton in the line at the Jackson Supermarket and went to buy something from another store.

68.     When trial prosecutor ADA Andre Jeanfreau asked him what happened at the Jackson Supermarket, Mr. Hamilton testified, "We just in line to get one thing, so I went to the store, the other store that's on the corner. We got what we had to get, came back and [Mr. Melton] was in line getting his stuff."

69.     Mr. Hamilton testified that he first noticed the shooter after he returned to the Jackson Supermarket, and that Mr. Dent was in front of Mr. Melton in the store's line. Referring to Mr. Dent, Mr. Hamilton stated, "When I came back – let's see. I think he was in line before – yeah, he was." ADA Jeanfreau asked, "Who was in line?" Mr. Hamilton answered, "Him, Cedric." ADA Jeanfreau asked, "Cedric was in front of [Mr. Melton] in line?" Mr. Hamilton confirmed, "Yes."

70.     Mr. Hamilton implied that after he returned to the Jackson Supermarket, he was in line with Mr. Melton long enough that he observed the shooter complete his purchase and walk to the payphone next to the store. Mr. Hamilton testified, "After he got his stuff, he was just standing over there like on the corner of the building by the pay phone . . . ."

71.     Mr. Hamilton's prior statements that OPDA suppressed contradicted his testimony at trial.

72.     When he spoke to the NOPD officer at the crime scene, Mr. Hamilton never claimed that he had seen the shooter before turning around in the vacant lot in response to the gunshot that killed Mr. Melton.

73.     Moreover, when Mr. Hamilton spoke to the NOPD officer at the crime scene and Detective Marchese later that night[6], he left out any mention of leaving Mr. Melton in line at the Jackson Supermarket or noticing the shooter <u>after</u> returning to the store's line.[7]

74.     Indeed, the first time Mr. Hamilton included the detail that he left Mr. Melton in line at the Jackson Supermarket was over two months later, during his statement to ADA Quinlan on November 10, 1997. However, whereas Mr. Hamilton testified at trial that he waited in line with Mr. Melton and observed the shooter ahead of them completing his purchase, Mr. Hamilton told ADA Quinlan that when he returned to the store, Mr. Melton had "just finished buying drinks," and the shooter "already had his stuff."

75.     Mr. Hamilton's claim at trial that he first noticed the shooter while waiting behind

---

[6]     Mr. Hamilton spoke to Detective Gary Marchese at 11:00 p.m. on September 2 at the Sixth District Station. Detective Marchese transcribed Mr. Hamilton's statement, and both Detective Marchese and Mr. Hamilton signed the transcribed statement.

[7]     In contrast to his trial testimony, Mr. Hamilton told Detective Marchese that he first noticed the shooter "when we got to the store." Mr. Hamilton stated that the shooter "was right in front of us buying something," and that that after the shooter made his purchase, "[he] went by the end of the building closest to the lot."

him in line at the Jackson Supermarket is further contradicted by his grand jury testimony during which he said, "When I came back [to the Jackson Supermarket], you know, he was standing on the corner . . . ." Mr. Hamilton confirmed that "it look[ed] like [the shooter] had already bought his groceries and stuff."

76.     Between giving statements to NOPD on September 2, 1997 to testifying at trial on May 18, 1999, Mr. Hamilton's account of what happened that night changed from seeing the shooter for the first time in the poorly lit vacant lot where his cousin was killed, to noticing him outside the Jackson Supermarket after returning from an errand, and finally to intentionally examining the shooter while waiting in line at the store with Mr. Melton.

77.     In addition to raising the question of why Mr. Hamilton's narrative changed so significantly over time, the metamorphosis of his account also undercuts his testimony about when he first saw the shooter and under what conditions—i.e., in a dark vacant lot, not outside of a well-lit store.

###     3.     Mr. Hamilton's opportunity to observe the shooter

78.     Mr. Hamilton's prior statements also contradicted his trial testimony as to how long he observed the shooter and his level of attention.

79.     At trial, Mr. Hamilton repeatedly testified that he had an extended opportunity to observe the shooter, and that he and the shooter were locked in a stare down outside the Jackson Supermarket.[8]

---

[8]     Mr. Hamilton did not testify at trial as to why he noticed the shooter in a crowded store parking lot, or what might have prompted the shooter to supposedly stare at him. Mr. Hamilton never claimed at trial—or in any of his other statements to NOPD or OPDA—that he witnessed any dispute between Mr. Melton and the shooter, or that Mr. Melton told him about any argument. It appears that NOPD and OPDA adopted the theory that the shooter and Mr. Melton had an argument outside the Jackson Supermarket solely on the basis of the report by an unknown woman to Valirey Melton—information that OPDA suppressed.

80.     ADA Jeanfreau asked "How long did you have a chance to look at the defendant at the grocery store?" Mr. Hamilton responded, "At the grocery store, I was looking at him, he was looking at me." In an effort to play up Mr. Hamilton's opportunity to observe the shooter, the prosecutor asked if they were "[j]ust kind of staring each other down," to which Mr. Hamilton nodded affirmatively.

81.     When ADA Jeanfreau later asked if Mr. Hamilton noticed "anything in particular" about the shooter while he was waiting outside the Jackson Supermarket, Mr. Hamilton claimed that "he [was] looking at me funny."

82.     ADA Jeanfreau asked Mr. Hamilton, "[H]ow long did you have a chance to look at him in the field?" Mr. Hamilton stated, "I kept turning around and I saw him behind us, you know."

83.     Mr. Hamilton's trial testimony as to his opportunity to observe the shooter was sharply contradicted by his prior statements.

84.     In his statements to the NOPD officer at the crime scene and Detective Marchese, Mr. Hamilton never claimed to have even seen the shooter at the Jackson Supermarket—let alone have a stare down with him.

85.     And in his statement to ADA Quinlan, Mr. Hamilton said that after he returned to find Mr. Melton in line at the Jackson Supermarket, he saw the shooter but Mr. Hamilton and his cousin only spent "a couple seconds" at the store before "walking home." Again, Mr. Hamilton did not claim to have been locked in a stare down with the shooter outside the store.

86.     Most notably, Mr. Hamilton did not claim in <u>any</u> of his prior statements that he kept looking back at the shooter as he followed Mr. Hamilton and Mr. Melton into the vacant lot. Mr. Hamilton embellished his account with this detail only at trial.

87.     Mr. Hamilton's four statements about what he saw the night of the crime contradict

15

key elements of his testimony at trial with respect to when he allegedly first noticed the shooter and his opportunity to observe the shooter. Two of the most critical elements of Mr. Hamilton's testimony at trial—that he noticed the shooter early on in the well-lit area outside of the Jackson Supermarket, and that he inexplicably focused his attention on the shooter over an extended period of time—plainly conflict with his prior statements to NOPD and OPDA.

88.     By withholding this critical information regarding Mr. Hamilton's changing narrative, OPDA undermined the defense's ability to cross-examine and impeach Mr. Hamilton at trial. This information would have been particularly significant given that Mr. Dent's conviction was, as OPDA acknowledged in 2022, "a one eye-witness case where certainly there [were] inconsistencies in Jerry Hamilton's statement."

89.     At trial, Mr. Hamilton's various statements could have been used to impeach his testimony that went uncontroverted in the May 1999 trial—counsel would have made much of the fact that his testimony changed literally every time he spoke to someone about what happened, even though he was only describing events that spanned a few minutes.

90.     The United States Supreme Court has held that in assessing a *Brady* claim, suppressed information is material when the prosecution's case is weak, including when the testimony of a lone witness is the only evidence linking the defendant to the crime. The Court has also held that a witness' testimony can be less reliable if it changed over time.[9]

91.     If OPDA had disclosed Mr. Hamilton's prior statements—specifically his statements to the NOPD officer at the crime scene and to Detective Marchese later that night—

---

[9]     *Smith v. Cain*, 565 U.S. 73, 76, 132 S. Ct. 627, 630, 181 L. Ed. 2d 571 (2012) ("Boatner's testimony was the *only* evidence linking Smith to the crime. And Boatner's undisclosed statements directly contradict his testimony[.] . . . Boatner's undisclosed statements were plainly material."); *Kyles v. Whitley*, 514 U.S. 419, 444, 115 S. Ct. 1555, 1571, 131 L. Ed. 2d 490 (1995) ("[T]he evolution over time of a given eyewitness's description can be fatal to its reliability.").

defense counsel would have cross-examined Mr. Hamilton as to how his initial descriptions of the shooter were plainly inconsistent with Mr. Dent's appearance at the time of the shooting and his arrest.

92.     After cross-examining Mr. Hamilton as to the way his story developed over time and the fact that he had described the shooter more than once in ways that were inconsistent with Mr. Dent's appearance, counsel also could have argued that the truth was closest to what Mr. Hamilton said to the NOPD officer: that he barely took note of the shooter before they were in the dark lot, and that upon hearing a gunshot he ran, then turned from some distance, and briefly saw in the dark a person pointing a gun at him who then turned and ran away himself.

> **B.     Detective Buras's statement in his notes and report that Valirey Melton told him that an unnamed woman provided her with Mr. Dent's name**

93.     For several days after the crime, Detective Buras had no leads on the shooter. On September 4, 1997 at 10:14 a.m., Detective Buras ran Mr. Dent's name through the Motions History computer system and generated Mr. Dent's RAP sheet.

94.     The Motions History computer system, or "Motions," as it was referred to by people familiar with it, was a database used by NOPD at the time of Mr. Dent's arrest that allowed police officers to search people's New Orleans criminal records and print their criminal histories in the form of RAP sheets.

95.     Among other things, the information in Motions listed as Mr. Dent's address 701 St. Mary Street, near the St. Thomas housing projects in New Orleans.

96.     Detective Buras was contacted by the decedent's mother Valirey Melton on September 4, 1997 at about 12:30 p.m.—about two hours <u>after</u> Detective Buras ran Mr. Dent's name through the Motions computer.

97.     In his handwritten notes, Detective Buras wrote Ms. Melton "heard from concerned

citizens that they know who shot her son and they informed her the P. [perpetrator] C.D. follow[ed] her son," and that they "had an argument at the Jackson food store."

98.     Detective Buras wrote the following update to the MORF at 12:54 p.m. on September 4:

> Ms. Melton stated that she had spoken to a female who stated she had observed the victim and the perpetrator at the Jackson Grocery Store on the night of the victim's murder. The female stated the perpetrator and the victim were involved in a verbal altercation because the perpetrator cut in line on him in front of the store. The female further stated the perpetrator followed the victim to the empty lot at Saint Thomas and Josephine where he shot him. The female further stated she knows the perpetrator as Cederic [sic] Dent who lives at 701 Saint Mary Street.

In contrast to his handwritten notes, Detective Buras's MORF does not state that "concerned citizens" provided Mr. Dent's name to Ms. Melton. Nor does the MORF indicate that Detective Buras or any NOPD officer subsequently reached out to identify and interview the unnamed woman.

99.     Mr. Dent did not reside at 701 St. Mary Street.

100.    At the time of the shooting, Mr. Dent lived with his then-girlfriend and their children at 719 North Roman Street in the Lafitte projects, over three miles away from the St. Mary Street address.

101.    According to the MORF, <u>after</u> Detective Buras spoke with Ms. Melton, he "ran the perpetrator's name through the N.O.P.D. computer" and obtained his personal information.[10]

102.    The unredacted version of Detective Buras's incident report largely repeats this

---

[10]     Detective Buras's MORF update stating that he ran Mr. Dent's name through the Motions computer <u>after</u> speaking with Ms. Melton at 12:30 p.m. on September 4, 1997 conflicts with the time stamp on the RAP sheet documenting that the RAP sheet was generated at 10:14 a.m.—<u>more than two hours before Detective Buras spoke with Ms. Melton.</u>

description of Ms. Melton's statement regarding the unnamed woman and her alleged observations of the crime. However, in the unredacted incident report, Detective Buras adds the detail that the unnamed woman "did not want to be identified," and specifies that he checked the Motions computer "[w]ith the information given by the female."

103.    In the version of Detective Buras's incident report that was disclosed to the defense before trial, OPDA redacted, among other things, the five paragraphs describing Mr. Melton's September 4 statement to Detective Buras and her report of an unnamed woman who supposedly witnessed the crime. By doing so, OPDA suppressed critical information regarding how Mr. Dent's name was injected into the investigation and prevented the defense from ever seeking to identify the unnamed woman, questioning her about any biases, and challenging the veracity of her account, including the inaccurate claim that Mr. Dent resided at 701 St. Mary Street.

104.    OPDA had no basis to redact this portion of the incident report.

105.    OPDA's redaction of this portion of the incident report indicates OPDA's understanding that the information was exculpatory.

106.    It was not until 2008—only after Mr. Dent filed a pro se request for records while incarcerated—that OPDA disclosed the unredacted version of Detective Buras's incident report, which described the unnamed woman and indicated how Mr. Dent became a subject of NOPD's investigation.

107.    OPDA never disclosed Detective Buras's handwritten notes, the MORF, or the RAP sheet.

108.    NOPD disclosed Detective Buras's handwritten notes, the MORF, and the RAP sheet in November 2021 after IPNO filed a request for records in 2020.

109.    If OPDA had properly disclosed Detective Buras's handwritten notes, the MORF,

and his unredacted incident report, Mr. Dent's counsel would have investigated the existence of this unnamed woman and cross-examined Detective Buras as to the fact that he relied on the uncorroborated story of an anonymous witness to whom he never spoke and, based on all available documentation, never attempted to speak. Counsel would have proceeded to elicit that Detective Buras therefore had no basis on which to judge whether that person could reliably identify Mr. Dent, name his home address, actually witnessed a verbal dispute outside the Jackson Supermarket, or whether she even existed.

110.    Defense counsel would have presented information, through live witness and municipal facilities record evidence, documenting that Mr. Dent lived at 719 North Roman Street and did not reside at 701 St. Mary Street, which would have undermined the credibility of the anonymous witness as well as the integrity and thoroughness of Detective Buras's investigation.

111.    Citing the time stamp on the belatedly disclosed RAP sheet, defense counsel would also have cross-examined Detective Buras as to how he could have known to search Mr. Dent's name in the Motions system two hours _before_ Valirey Melton supposedly named Mr. Dent as a possible suspect. This would have undermined the integrity of the investigation and Detective Buras's credibility regarding how he identified Mr. Dent as a suspect.

112.    While it cannot be known based on the available information whether that conversation occurred and what was really said, especially since Ms. Melton has passed away, the fact that the various layers of the alleged conversation were hidden from Mr. Dent meant that his attorney was blocked from several powerful avenues of impeachment of the detective who marshalled the evidence that Mr. Dent committed this crime. Armed with full knowledge that Detective Buras's report depended on an anonymous person with two degrees of separation, whom the detective never attempted to identify or interview, counsel could have undermined the integrity

and thoroughness of Detective Buras's investigation and the credibility of his report.

### C. *Messages on the decedent's pager including a possible death threat*

113.   In addition to describing the "concerned citizens" or unnamed woman who supposedly provided Mr. Dent's name to Valirey Melton, both Detective Buras's handwritten notes and unredacted incident report list seven phone numbers on the decedent's pager that was found on his waistband at the crime scene.

114.   The unredacted incident report reads, "On the victim's left waist band was a blue Radiophone Pager. The detective obtained the pager which contained the following numbers."

115.   At 9:42 p.m.—less than 30 minutes before he was shot —Mr. Melton received a pager message "825-9397-99." In his handwritten notes, Detective Buras writes "Jerry Hamilton" next to this number. In the unredacted incident report, Detective Buras writes that "the number was found to be that of Jerry Hamilton." There is no indication that the call was made from a residential landline, and there is no explanation as to how Detective Buras associated the number with Mr. Hamilton or where Mr. Hamilton was when he sent this message.

116.   During the 1990s, the code "99" was pager slang for "Good night."[11]

117.   And at 4:40 p.m.—approximately six hours before the shooting and before Mr. Dent supposedly met Mr. Melton and Mr. Hamilton for the first time—Mr. Melton received a 13-digit pager message "862-0643-911-187." Detective Buras's handwritten notes read "UNK" or "unknown" next to this number, and the unredacted incident report reads that the number "was of unknown destination [sic]."

118.   At 9:19 p.m.—only 50 minutes before the shooting—Mr. Melton's pager received

---

[11]   *See* Joe Mozingo, *Teens Create Language of Pager-Speak*, Wash. Post. (Nov. 26, 1997), https://www.latimes.com/archives/la-xpm-1997-nov-26-mn-57816-story.html ("99: Good night (read 'Nighty-night'").

a call from the same number, 862-0643.

119.    Mr. Dent has never been associated with the number "862-0643."

120.    During the relevant time, "911" was pager slang for "emergency" or "important."[12]

121.    During the relevant time, "187" was pager slang for "murder," "death" or "I hate you."[13]

122.    The origin of "187's" meaning is California Penal Code section 187, which defines murder as 'the unlawful killing of a human being, or a fetus, with malice aforethought."[14]

123.    As early as 1992, the rapper Dr. Dre popularized the use of "187" as a term for murder. Dr. Dre's 1992 song "Deep Cover" includes the chorus lyrics: "Yeah, and you don't stop ('Cause it's 1-8-7 on a undercover cop)."

124.    In July 1997—less than two months before the shooting—the movie *One Eight Seven*, starring Samuel L. Jackson and the rapper Clifford Smith, Jr. (also known as Method Man of the rap group Wu-Tang Clan), was released nationwide, including in New Orleans. In the movie, Smith's character is a high school student and gang member who threatens his teacher played by Jackson by writing "187" on every page of a textbook and then attempts to kill him.

125.    In July 1996, the band Sublime released its album *Sublime*, which includes the song "April 29, 1992 (Miami)." The song's lyrics reference "187" as slang for murder and read in part, "It's about coming up and staying on top / And screaming 187 on a motherfuckin' cop." By May 1997, the album entered *Billboard Magazine*'s Top 20, and *Rolling Stone* described Sublime as

---

[12]    *Id.*

[13]    *Id.*; *see also* 187, Dictionary.com, https://www.dictionary.com/e/slang/187/ (last visited June 6, 2023) ("187 is slang for 'murder.' 187 is a term associated with hip-hop songs dealing with topics of crime or gang violence.").

[14]    Cal. Penal Code § 187(a).

"the biggest rock act of 1997."[15]

126.    In 1998, the New Orleans rappers Juvenile and BG released a song "187." The song's lyrics use "187" as slang for murder and read in part, "It's gon' be 187 after 187 / It's gon' be blukah after blukah out my MAC-11," referencing the sound of submachine gun fire. At the time, Juvenile and BG were members of the New Orleans rap group the Hot Boys, featuring New Orleans native Lil Wayne.

127.    Numerous courts decisions have discussed instances in which "187" was used as a threat of violence.

128.    In *Kouiyoth v. Kramer*, in January 1997, a man later convicted of attempted murder and related crimes sent 10 messages to a victim's pager before shooting at his house with a shotgun.[16] The court observed that "[t]he number 187, the Penal Code section for murder, was used in these messages approximately 20 times."[17]

129.    In *People v. Hale*, before attacking the victim with a hammer in 1996, the defendant sent her "many pages with the message '187' which she knew to be a Penal Code section number associated with murder."[18]

130.    In *State v. Wickfall*, in Tennessee in 1995, the defendant sent pager messages to his former girlfriend Keena Thomas containing "911" and "187" shortly before killing her current

---

[15]    *See* Mark Kemp, *Bradley Nowell: Life After Death*, Rolling Stone (Dec. 25, 1997), https://www.rollingstone.com/music/music-news/bradley-nowell-life-after-death-250120/ ("Sublime has become the biggest rock act of 1997[.]") (last visited July 19, 2023); *see also* Billboard 200, Billboard, https://www.billboard.com/charts/billboard-200/1997-05-03/ (listing *Sublime* at No. 17) (last visited July 19, 2023).

[16]    *Kouiyoth v. Kramer*, No. 2:04-CV-0662MCEJFMHC, 2009 WL 2868626, at *2 (E.D. Cal. Sept. 2, 2009) (on habeas review).

[17]    *Id.*

[18]    *People v. Hale*, 75 Cal. App. 4th 94, 100, 88 Cal. Rptr. 2d 904, 908 (Cal. Ct. App. 1999).

boyfriend.[19] The court observed that "Ms. Thomas testified that 911 indicated the urgency of Defendant's need to speak with her."[20] Ms. Thomas provided the following testimony regarding the number 187.:

| State: | 187, what significance is that? What's that mean? |
|---|---|
| Ms. Thomas: | It mean-it means-well like in slang it means murder. I guess it meant he was mad or whatever. |
| State: | In slang it means what? |
| Ms. Thomas: | Murder. |
| State: | What sort of slang does 187 mean murder in? |
| Ms. Thomas: | Just like rap songs.[21] |

The court of appeals also affirmed the trial court's decision to take judicial notice of California Penal Code section 187 and admit it into evidence.[22]

131.     In *State v. Walker*, in Ohio in April 1998, the defendant paged his former girlfriend "187," which the court observed "was the police code for murder," before assaulting her.[23]

132.     OPDA failed to disclose Detective Buras's handwritten notes that included the seven phone numbers and any accompanying messages found on the decedent's pager.

133.     In addition, in the version of Detective Buras's incident report that was disclosed to the defense before trial, OPDA redacted, among other things, the seven phone numbers and any accompanying messages found on the decedent's pager

134.     OPDA had no basis to redact this portion of the incident report.

---

[19]     *State v. Wickfall*, No. 02C01-9711-CR-00442, 1999 WL 360163, at *1 (Tenn. Crim. App. June 3, 1999).

[20]     *Id.*

[21]     *Id.*

[22]     *Id.* at *4-5.

[23]     *State v. Walker*, No. 17678, 2000 WL 873222, at *1 (Ohio Ct. App. June 30, 2000).

135.     OPDA's redaction of the seven phone numbers and any accompanying messages found on the decedent's pager indicates OPDA's understanding that the information was exculpatory.

136.     By redacting this portion of the incident report, OPDA suppressed exculpatory information. OPDA prevented the defense from questioning Mr. Hamilton about where he was when he sent his cousin a pager message less than 30 minutes before the shooting, and why he messaged Mr. Melton "99" or "good night."

137.     More importantly, by redacting the number ending ominously in "911-187," OPDA prevented the defense from investigating who sent Mr. Melton this message and why he or she conveyed to the decedent a possible death threat six hours before the shooting and then paged him again 50 minutes before the shooting. Likewise, OPDA prevented the defense from sharing with the jury that Mr. Melton received a possible death threat the same day he was shot, and that there were potentially other people who wanted to do him serious harm.

138.     If OPDA had properly disclosed Detective Buras's unredacted incident report or his handwritten notes it was based on, defense counsel would have highlighted to the jury that "99," "911," and "187" were popular pager slang at the time of the shooting; the use of "187" as a threat or reference to murder in both popular culture and actual murder cases; and telephone directory records that would show that the number that sent Mr. Melton the possible death threat did not belong to Mr. Dent. Counsel would have been able to show the jury that at least one person who was not Mr. Dent had an interest in committing violence against Mr. Melton the day of the shooting.

139.     Moreover, counsel would have cross-examined Detective Buras as to why he did not investigate at least five of the seven numbers that called Mr. Melton's pager, including the

number 862-0643, despite the facts that it appeared to include an urgent ("911") death threat ("187") message to the decedent six hours before the shooting and that the number paged the decedent again only 50 minutes before the murder. This cross-examination of Detective Buras would have undermined the integrity and thoroughness of Detective Buras's investigation and the credibility of his report.[24]

### D.    Statement of a second eyewitness whose description of the shooter did not match Mr. Dent's appearance

140.    In his handwritten notes, Detective Buras also identifies a second eyewitness "Rodney" from the "Jackson Food Store" who saw a man in a white shirt with a "blue steel" "weapon in [his] right hand" follow Mr. Melton from the store to the lot where he was killed. Rodney observed that the shooter was 5'6" and weighed 130 to 140 pounds. Rodney also said that the shooter had been "stand[ing] outside the store at the small window." The notes do not indicate that Detective Buras or any NOPD officer subsequently reached out to further question Rodney.

141.    As noted above, NOPD's arrest report documents that Mr. Dent was 5'10" and weighed 160 pounds at the time of his arrest on September 13, 1997, 11 days after the shooting.

142.    As previously noted, around the time of the shooting and at the time of his arrest, Mr. Dent had several visible front gold teeth, a mustache, and a flat-top haircut.

143.    Rodney's description of the shooter did not include any reference to gold teeth, a mustache, or a flat-top haircut.

144.    There is no mention of Rodney anywhere else in the documents disclosed by OPDA

---

[24]    *Kyles v. Whitley*, 514 U.S. 419, 446, 115 S. Ct. 1555, 1572 (1995) (citation omitted) ("A common trial tactic of defense lawyers is to discredit the caliber of the investigation or the decision to charge the defendant, and we may consider such use in assessing a possible *Brady* violation[.]"); *Lindsey v. King*, 769 F.2d 1034, 1042 (5th Cir. 1985) (awarding new trial of prisoner convicted in Louisiana state court because withheld *Brady* evidence "carried within it the potential . . . for the . . . discrediting . . . of the police methods employed in assembling the case").

or NOPD.

145.    However, in the MORF, Detective Buras passed off Rodney's description of the

shooter as that of Jerry Hamilton. Detective Buras provided the following description of Mr.

Hamilton's statement to Detective Marchese:

> As the victim and witness [Jerry Hamilton] reached the middle of
> the empty lot the perpetrator shot the victim once in the head and
> fled into the Saint Thomas Housing Development. During the
> statement from the witness the detective [Marchese] obtained a
> physical description of the perpetrator, the perpetrator was described
> as a black male, about 5'6" weighing between 130 and 140 pounds
> wearing a white t-shirt with unknown lettering on the front and dark
> colored pants.
>
> The Witness further furnished the detective with the description of
> the weapon, the weapon was described as a[n] unknown type blue
> steel hand gun.

146.    Neither in his statement to Detective Marchese nor in any of his five other accounts

of that night did Mr. Hamilton describe the shooter as weighing between 130 and 140 pounds.

147.    Neither in his statement to Detective Marchese nor in any of his five other accounts

of that night did Mr. Hamilton describe the shooter's weapon as a "blue steel hand gun." In fact,

in his interview with ADA Quinlan, Mr. Hamilton stated that the shooter had a "black gun."

148.    Rodney was the only witness who described the shooter as weighing between 130

and 140 pounds, and the only witness who described the shooter's weapon as "blue steel." But

Rodney's existence was suppressed by OPDA, and he was unknown to Mr. Dent until NOPD

finally disclosed Detective Buras's handwritten notes in 2021.

149.    OPDA should have disclosed those notes to the defense.

150.    By failing to disclose Detective Buras's notes, OPDA suppressed critical

information—the existence of a second eyewitness whose description of the shooter was markedly

different from Mr. Dent's appearance at the time of his arrest. OPDA prevented the defense from

interviewing Rodney or calling him as a witness.[25]

151.   Detective Buras's handwritten notes about Rodney are material because they would have led the defense to seek out Rodney as a witness, as Rodney may have been able to definitively say that Mr. Dent was not the shooter, and in any event could have told the jury that the man he saw did not have gold teeth, a mustache, or a flat-top haircut like Mr. Dent did, that he was much shorter than Mr. Dent, and that he weighed significantly less than Mr. Dent.

152.   Rodney could also have confirmed that he was not asked to participate further in Detective Buras's investigation. Counsel would also have cross-examined Detective Buras about his conversation with Rodney and his lack of follow-up. The testimony of Rodney and Detective Buras—specifically with respect to Detective Buras's failure to follow up with Rodney—would have undermined the integrity and thoroughness of Detective Buras's investigation and the credibility of his report.

153.   Rodney would also have identified additional witnesses who were at the Jackson Supermarket and who could have challenged Mr. Hamilton's account of the night of the shooting. The prosecution's case would not have turned on the testimony of a lone purported eyewitness.

154.   Counsel would have confronted Detective Buras with the MORF to demonstrate that he attributed to Jerry Hamilton Rodney's description of the shooter and the weapon and omitted Rodney from the narrative. This would have also undermined the integrity and thoroughness of Detective Buras's investigation and the credibility of his report because it would have shown that the detective either knowingly passed Rodney's description off as that of Mr.

---

[25]   Even if Detective Buras attributed Rodney's description of the shooter to Mr. Hamilton, OPDA should have disclosed the MORF, and as discussed above, *supra* ¶ 91, defense counsel would have cross-examined Mr. Hamilton as to why his description of the shooter was plainly inconsistent with Mr. Dent's appearance of the time of the shooting and his arrest.

Hamilton to make the latter's ability to identity the shooter seem more reliable, or negligently confused the two, which would raise questions about the accuracy of and attention to detail in his report.

155.    Rodney's testimony would have been particularly significant given that Mr. Dent's conviction was, as the State acknowledged at the hearing on the motion to vacate that conviction, "a one eye-witness case where certainly there [were] inconsistencies in Jerry Hamilton's statement."

156.    Altogether, OPDA withheld information that was favorable and cumulatively material, including information highlighting (A) the extent of the inconsistencies in the narrative of the lone eyewitness Jerry Hamilton; (B) the existence of an unnamed woman who supposedly provided Mr. Dent's name to Valirey Melton, who then relayed it to Detective Buras, and is likely the only reason Mr. Dent became a subject of NOPD's lagging investigation; (C) messages on Mr. Melton's pager including a possible death threat that the decedent received six hours before he was shot, as well as a call from the same number only 50 minutes before the murder; and (D) the statement of a second eyewitness Rodney who provided a description of the shooter that did not match Mr. Dent's appearance at the time of his arrest.

## IV.    OPDA's suppression of the information withheld from Mr. Dent violated his constitutional right to the disclosure of favorable information

157.    OPDA had a duty to disclose the information withheld from Mr. Dent, including information that could have been used by the defense to impeach the prosecution's only purported eyewitness, attack the thoroughness and integrity of the investigation, and develop evidence of an alternative suspect.

158.    OPDA's failure to disclose the information withheld from Mr. Dent violated his Fifth and Fourteenth Amendment constitutional rights recognized by *Brady* and its progeny.

159.     OPDA's *Brady* violations were especially significant in Mr. Dent's case, because his conviction was by a non-unanimous jury, and it was based on a single eyewitness.

160.     Undisclosed impeachment evidence is likely to be considered material where the prosecution's case relies primarily on a single witness.[26]

161.     Each of the *Brady* violations was a cause of Mr. Dent's wrongful conviction and incarceration. The cumulative effect of multiple *Brady* violations likewise caused Mr. Dent's wrongful conviction and incarceration.

**V.     OPDA's longstanding policy or custom of violating the constitutional rights of defendants by not disclosing material, favorable information to them**

162.     OPDA's repeated violation of Mr. Dent's constitutional right to the disclosure of favorable information was no isolated incident. To the contrary: it was part of a longstanding pattern of similar violations by OPDA that started years before Mr. Dent's trial and continued for many years after.

163.     OPDA has maintained and carried out an unconstitutional policy or custom of violating the constitutional rights of defendants charged with crimes by failing to disclose to them information that is favorable to them.

164.     Indeed, in a 2017 opinion referencing OPDA, the Louisiana Fourth Circuit Court of Appeal wrote that it was "not unmindful of the storied, shameful history of the local prosecuting authorities' noncompliance" with its duty to disclose favorable information to defendants.

---

[26]     *Smith v. Cain*, 565 U.S. 73, 76, (2012) ("Boatner's testimony was the *only* evidence linking Smith to the crime. And Boatner's undisclosed statements directly contradict his testimony: . . . Boatner's undisclosed statements were plainly material." (emphasis in original)); *see also Giglio v. United States*, 405 U.S. 150, 154 (1972) (quoting *Napue v. Illinois*, 360 U.S. 264, 79 S. Ct. 1173, 3 L.Ed.2d 1217 (1959)) ("When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within [the] general rule [of *Brady*]."); *State v. Bright*, 2002-2793 (La. 5/25/04), 875 So. 2d 37, 43–44 ("When the State's case hinges on the testimony of one eyewitness, the *Brady* violation looms larger.").

165.     As a result of this unconstitutional policy or custom, OPDA has engaged in the wrongful prosecution of innocent persons and (upon information and belief) has failed in many such instances to prosecute the real perpetrators.

### E.     Unconstitutional written policy

166.     In 1987, Harry Connick Sr.—the then-head of OPDA and its official policymaker under Louisiana law—officially adopted or promulgated a "Policy Manual" for OPDA. In a letter included in the manual, Connick stated that "we have developed a policy manual outlining the duties and responsibilities of those who work" at OPDA.

167.     The manual, which, upon information and belief, remained in force during the period of Mr. Dent's trial, included a policy regarding the disclosure of favorable information to defendants that provided in pertinent part: "In most cases, in response to the request of defense attorneys, the Judge orders the State to produce so-called *Brady* material—that is, information in the possession of the State which is exculpatory regarding the defendant."

168.     This policy was insufficient, inaccurate, and a violation of the constitutional requirements applicable to OPDA, in that it suggested that OPDA prosecutors were obligated to disclose favorable information to a defendant only if the defendant's attorney requested such disclosure when, in truth and in fact, that obligation existed regardless of whether or not the defendant's attorney made such a request. This policy was insufficient, inaccurate, and a violation of the constitutional requirements applicable to OPDA, in that it suggested that OPDA prosecutors were obligated to disclose favorable information to a defendant only if a judge ordered them to do so, when, in truth and in fact, that obligation existed regardless of whether or not the judge ordered disclosure.

169.     This policy was insufficient, inaccurate, and a violation of the constitutional requirements applicable to OPDA, in that it required OPDA prosecutors to disclose only

"exculpatory" information when, in truth and in fact, OPDA also was required to disclose information that could be used to impeach the trial testimony of OPDA witnesses or was otherwise favorable to the defendant, even if it did not directly exculpate the defendant.

170.    This policy was insufficient, inaccurate, and a violation of the constitutional requirements applicable to OPDA, in that it did not require OPDA prosecutors to disclose information that was not initially in OPDA's possession but was only in the possession of NOPD when, in truth and in fact, OPDA was required to disclose such information.

171.    This policy was insufficient, inaccurate, and a violation of the constitutional requirements applicable to OPDA, in that it suggested that OPDA's obligation to disclose favorable information to a defendant charged with a crime applied only in most, but not all, cases.

172.    This policy was insufficient, inaccurate, and a violation of the constitutional requirements applicable to OPDA, in that it did not expressly require OPDA prosecutors to disclose information that was favorable to the defendant even if that information was not documented.

### F.    *Unconstitutional unwritten policy or custom*

173.    OPDA has maintained and carried out, for many years, an unwritten policy or custom of not disclosing favorable information to defendants charged with crimes.

#### 1.    *OPDA's numerous violations of* Brady

174.    The existence of this unwritten policy or custom is supported by publicly available information in cases in which a court has determined, or OPDA has acknowledged, that OPDA failed to disclose favorable information to a defendant charged with a crime. Based solely on that publicly available information, OPDA has failed to make such disclosures in at least 45 cases, not including Mr. Dent's.

175.    Of these 45 cases, at least 27 involved OPDA's failure to disclose a statement that

an OPDA witness made prior to trial that was inconsistent with the witness's trial testimony—one of the types of constitutional violations that occurred in Mr. Dent's case.

176.    Of these 45 cases, at least nine resulted in reversals of convictions by the United States Supreme Court; the United States Court of Appeals for the Fifth Circuit; or the Louisiana Supreme Court on the basis of *Brady* violations before Mr. Dent's trial. *See Kyles v. Whitley,* 514 U.S. 419 (1995); *Monroe v. Blackburn,* 607 F. 2d 148 (5th Cir. 1979); *Davis v. Heyd,* 479 F. 2d 446 (5th Cir. 1973); *State v. Knapper,* 579 So. 2d 956 (La. 1991); *State v. Rosiere,* 488 So. 2d 965 (La. 1986); *State v. Perkins,* 423 So. 2d 1103 (La. 1982); *State v. Curtis,* 384 So. 2d 396 (La. 1980); *State v. Falkins,* 356 So. 2d 415 (La. 1978); *State v. Carney,* 334 So. 2d 415 (La. 1976). Of these nine cases, six involved OPDA's failure to disclose a statement that an OPDA witness made prior to trial that was inconsistent with the witness's trial testimony—one of the types of constitutional violations that occurred in Mr. Dent's case.

177.    The above-described instances in which OPDA failed to disclose favorable information to the defendants it prosecuted significantly understates the actual number of times that OPDA has violated the constitutional rights of defendants in this way. Unlike other types of constitutional violations, where the defendant is presumably well aware of the potential or actual violation—for example, the use of excessive force or a violation of the defendant's right to a speedy trial—a violation of a defendant's right to the disclosure of favorable information is inherently difficult to detect because, by definition, it involves the suppression of information.

178.    This phenomenon has been widely recognized by leading members of the legal profession. For example, former United States Supreme Court Justice Ruth Bader Ginsberg has stated that *Brady* violations "are not easily detected" and are frequently the result of a "chance discovery." And former United States Supreme Court Justice Byron White has stated that the

"judicial process will by definition be ignorant of" a violation involving suppressing evidence when it occurs, and that "it is reasonable to suspect that most violations never surface."

179.    Another reason why the above-described instances in which OPDA failed to disclose favorable information to the defendants it prosecuted significantly understates the actual number of times that OPDA has violated the constitutional rights of defendants in this way is that (upon information and belief) most cases filed by OPDA have resulted in a guilty plea and no trial. In these cases, it is likely that the pleas occurred prior to the time that the defendants would have received or uncovered any *Brady* material. In these cases, it also is far less likely that the defendants, having entered a guilty plea and having provided a factual predicate for their pleas, would pursue a post-conviction challenge to their convictions. Since post-conviction litigation is the procedural stage at which many *Brady* violations are uncovered, the substantial prevalence of guilty pleas among OPDA cases dramatically reduces the likelihood of *Brady* violations being detected at anything close to the rate at which they actually occur.

180.    Another reason why the above-described instances in which OPDA failed to disclose favorable information to the defendants it prosecuted significantly understates the actual number of times that OPDA has violated the constitutional rights of defendants in this way is that (upon information and belief) there have been cases in which a court determined that OPDA violated *Brady* but the decision was not publicly reported. Connick has testified that this in fact has occurred. In such cases, it is difficult if not impossible for persons such as Mr. Dent to identify the cases in which failures to disclose favorable information occurred.

181.    Another reason why the above-described instances in which OPDA failed to disclose favorable information to the defendants it prosecuted significantly understates the actual number of times that OPDA has violated the constitutional rights of defendants in this way is that

(upon information and belief) there have been cases with *Brady* violations in which courts granted relief on other grounds.

> 2.   *Additional court decisions establishing OPDA's policy or custom of violating* Brady

182.   In addition to the cases described above, in at least four cases that were decided before Mr. Dent's trial, the Louisiana Supreme Court ruled that a prosecutor from another Louisiana district attorney's office failed to disclose favorable information to a defendant charged with a crime. These cases provide further support for the conclusion that OPDA knew its constitutional obligation to disclose favorable information to the defendants it prosecuted, and yet repeatedly violated that obligation.

183.   OPDA's persistent failure to honor its *Brady* obligations is remarkable, especially because several of the United States Supreme Court's leading decisions in this area of the law involved OPDA itself. For example, as noted above, in 1995—less than two years before Mr. Dent's trial—the United States Supreme Court decided *Kyles v. Whitley*. In that case, the United States Supreme Court held that OPDA violated the defendant's rights under *Brady* by failing to disclose information that the defendant could have used to impeach the credibility of OPDA witnesses who testified at the defendant's trial—one of the types of *Brady* violations that occurred in Mr. Dent's case.

184.   The fact that OPDA's violations of defendants' *Brady* rights continued even after the *Kyles* decision supports the conclusion that the continued violations were the result of OPDA's unwritten policy or custom of not complying with its *Brady* obligations.

185.   OPDA's description of, and reaction to, the *Kyles* decision provides further support for that conclusion. Connick, the head of OPDA at the time of the decision, has testified (incorrectly) that *Kyles* "wasn't a *Brady* case." He also testified that he did not recall that the

United States Supreme Court ruled in *Kyles* that the defendant's claim—that OPDA violated its *Brady* obligations—was valid. He also testified that he saw no need to change OPDA's *Brady* policy after the *Kyles* decision. He also testified that compliance with the *Kyles* decision was "not realistic," stating, "insofar as what was in the police file, who the hell knows[.]" And he also has suggested that he disagreed with the *Kyles* decision, stating that "[j]ust because a guy puts on a black robe doesn't mean he is right." This testimony, by the longtime Orleans Parish District Attorney, reflects OPDA's disdain for and disregard of the United States Supreme Court's decision in *Kyles* and, in turn, OPDA's obligations under *Brady*.

186.    Connick's disdain for the United States Supreme Court's decision in *Kyles* was not lost on members of his office. In the re-trial of the defendant in *Kyles*, the OPDA prosecutor stated in court that the Court's decision in *Kyles* was wrong.

187.    Despite OPDA's string of *Brady* violations before and including *Kyles*, OPDA failed to take adequate measures to prevent future violations. It did not revise its written *Brady* policy. It did not conduct adequate training for OPDA prosecutors on their *Brady* obligations. And it did not take disciplinary action against OPDA prosecutors who violated *Brady*.

188.    All of these statements, actions, and failures to act in the wake of *Kyles* reflect OPDA's disdain and disregard for its obligations under *Brady*, consistent with its unwritten policy or custom of not complying with those obligations.

### 3.    OPDA's failure to train and supervise

189.    OPDA's policy or custom of violating the constitutional rights of defendants charged with crimes by failing to disclose to them information favorable to them is also demonstrated by its failure to properly and adequately train and supervise OPDA prosecutors with respect to their *Brady* obligations.

190.    OPDA's failure to properly and adequately train and supervise OPDA prosecutors

with respect to their *Brady* obligations is reflected in many different ways.

191.   As described above, OPDA's written *Brady* policy, as reflected in OPDA's training manual, inaccurately described OPDA's *Brady* obligations in several different ways.

192.   Several former OPDA prosecutors have testified that they did not recall receiving any training on *Brady* at OPDA.

193.   OPDA failed to properly and adequately train and supervise OPDA prosecutors with respect to their obligation to disclose NOPD supplemental reports that contained information favorable to defendants charged with crimes.

194.   Keva Landrum-Johnson, the former head of OPDA, has testified that she did not recall any training for OPDA prosecutors on how to handle post-conviction claims that OPDA violated its *Brady* obligations.

195.   OPDA also failed to utilize checklists, audits, reviews, or coordinators to ensure that its prosecutors complied with OPDA's *Brady* obligations.

196.   OPDA also failed to discipline OPDA prosecutors who violated OPDA's *Brady* obligations.

197.   For example, Connick has testified that OPDA failed to discipline OPDA prosecutors who violated OPDA's *Brady* obligations because it would make his job more difficult.

198.   Connick has testified that he disciplined only one prosecutor during his 30-year tenure for violating OPDA's *Brady* obligations and that, in that instance, the "discipline" consisted of Connick telling the prosecutor to be more careful the next time.

199.   As a result of OPDA's failure to discipline OPDA prosecutors who violated OPDA's *Brady* obligations, OPDA prosecutors had little or no reason to be concerned about the consequences if they violated those obligations.

200.    As described above, OPDA and the heads of OPDA were aware or should have been aware that OPDA prosecutors had repeatedly violated OPDA's *Brady* obligations and that there was a need to train and supervise prosecutors in order to prevent future, similar violations. OPDA's failure to train or supervise its prosecutors amounted to deliberate indifference to defendants' constitutional rights under *Brady*.

### FIRST CAUSE OF ACTION—42 U.S.C. § 1983
### (DEFENDANT JASON R. WILLIAMS)

201.    Paragraphs 1 through and including 200 are repeated and re-alleged as if fully set forth herein.

202.    OPDA, acting under color of law, withheld from Mr. Dent favorable information relating to the murder of Mr. Melton that was material to Mr. Dent's guilt or innocence, in violation of his right to the disclosure of such information guaranteed by the Fifth and Fourteenth Amendments of the United States Constitution.

203.    At all times relevant to this action, OPDA maintained an unconstitutional written policy, officially adopted and promulgated by OPDA and the heads of OPDA, with respect to OPDA's obligation to disclose favorable information to the defendants it prosecuted.

204.    At all times relevant to this action, OPDA maintained an unconstitutional unwritten policy, officially adopted and promulgated by OPDA and the heads of OPDA, with respect to OPDA's obligation to disclose favorable information to the defendants it prosecuted.

205.    At all times relevant to this action, OPDA failed to provide adequate training or supervision of OPDA prosecutors with respect to OPDA's obligation to disclose favorable information to the defendants it prosecuted, despite OPDA's awareness of many prior instances in which it violated *Brady*—including in its prosecution of Curtis Lee Kyles, whose conviction was vacated by the United States Supreme Court in *Kyles v. Whitley* less than two years before Mr.

Dent's trial—and despite the fact that it was obvious that such training and supervision was required in order to prevent other *Brady* violations. This failure to train and supervise was sufficiently common and well-settled that it constituted a custom that fairly represented OPDA's official policy of not complying with its obligation to disclose favorable information to the defendants it prosecuted.

206.    At all times relevant to this action, OPDA's persistent and widespread custom, reflected in numerous cases, of failing to disclose favorable information to the defendants it prosecuted; its failure to adequately train and supervise OPDA prosecutors with respect to OPDA's *Brady* obligations; and other statements, actions, and omissions reflecting OPDA's failure to comply with or otherwise take seriously its *Brady* obligations, were, when taken as a whole, sufficiently common and well-settled that they constituted a custom that fairly represented OPDA's official policy of not complying with its obligation to disclose favorable information to the defendants it prosecuted.

207.    OPDA and the heads of OPDA were on actual or constructive notice that the above-described official policies and customs failed to protect the right of Mr. Dent and other defendants like him under the Unites States Constitution to the disclosure of favorable information, but were deliberately indifferent to the known and/or obvious consequence that constitutional violations would result from these official policies and customs.

208.    The policies and customs set forth above were the moving force that caused the deprivation of Mr. Dent's right under the United States Constitution to the disclosure of favorable information that was material to Mr. Dent's guilt or innocence.

209.    As a result of OPDA's violations of Mr. Dent's constitutional rights, Mr. Dent was wrongfully convicted for a crime he did not commit and imprisoned for 25 years.

210.    The conduct set forth above was the cause in fact and proximate cause of Mr. Dent's injuries and damages.

211.    Defendant Williams, as the representative of OPDA, is liable to Mr. Dent pursuant to 42 U.S.C. § 1983.

### SECOND CAUSE OF ACTION—LOUISIANA REVISED STATUTE § 22:1269 (DEFENDANTS ABC INSURANCE COMPANIES 1–10)

212.    Paragraphs 1 through and including 211 are repeated and realleged as if fully set forth herein.

213.    Defendants ABC Insurance Companies 1–10 may have issued and currently have in effect one or more policies of insurance covering Defendant Williams and/or OPDA with regard to the actions complained of herein and obligating Defendants ABC Insurance Companies 1–10, jointly and/or severally, to pay on behalf of Defendant Williams and/or OPDA any sums the insureds may become obligated to pay Mr. Dent or to indemnify Defendant Williams and/or OPDA for any sums the insureds may become obligated to pay Mr. Dent.

214.    As described above, Defendant Williams, as the representative of OPDA, is liable to Mr. Dent for all damages sustained by Mr. Dent, costs and reasonable attorney's fees. Defendants ABC Insurance Companies 1–10 may be contractually obligated to pay all sums on behalf of Defendant Williams and/or OPDA or to indemnify the insureds for these sums.

215.    Defendants ABC Insurance Companies 1–10 may be liable to Mr. Dent for any and all sums described above up to their policy limits, notwithstanding the fact that Defendant Williams and/or OPDA may themselves be able to assert claims of privilege or immunity from liability.

216.    Pursuant to Louisiana Revised Statute § 22:1269 (B), Mr. Dent brings a direct action against Defendants ABC Insurance Companies 1–10 to recover any and all sums they are

obligated to pay him on behalf of their insureds or for which they are obligated to indemnify their insureds.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Cedric Dent requests that this Court enter judgment as follows:

(1) On the First Cause of Action, against Defendant Jason R. Williams, as the representative of the Orleans Parish District Attorney's Office, compensatory, nominal, and punitive damages, plus pre- and post-judgment interest; costs; and reasonable attorney's fees pursuant to 42 U.S.C. § 1988;

(2) On the Second Cause of Action, against Defendants ABC Insurance Companies 1–10, an amount equal to any and all sums they are obligated to pay Mr. Dent on behalf of Defendant Jason R. Williams and/or the Orleans Parish District Attorney's Office or for which they are obligated to indemnify the insureds; and

(3) On both causes of action, granting Mr. Dent such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Mr. Dent demands a trial by jury on both causes of action set forth above.

Respectfully submitted,

*/s/ Chloé M. Chetta*
Chloé M. Chetta, LA Bar No. 37070
Robert A. Waldrup, LA Bar No. 37345
BARRASSO USDIN KUPPERMAN
FREEMAN & SARVER, L.L.C.
909 Poydras St., Suite 2350
New Orleans, Louisiana 70112
Telephone: (504) 589-9700
cchetta@barrassousdin.com
rwaldrup@barrassousdin.com

Blair G. Brown, DC Bar No. 372609*
ZUCKERMAN SPAEDER LLP
1800 M Street NW
Suite 1000
Washington, DC 20036
Telephone: (202) 778-1800
bbrown@zuckerman.com

Josh T. Mathew, NY Bar No. 5785977*
ZUCKERMAN SPAEDER LLP
485 Madison Avenue
10th Floor
New York, NY 10022
Telephone: (212)704-9600
jmathew@zuckerman.com

*Pro hac vice application pending

Attorneys for Plaintiff Cedric Dent